## Lyle et al. v. Snowden's Adm'x.

June 1, 1943.

Robert R. Friend and John W. Walker for appellants.

Shumate & Shumate and Ben H. Scott for appellee.

OPINION OF THE COURT BY VAN SANT, COMMISSIONER—Reversing.

The petition was filed by appellee, the administratrix of the estate of W. M. Snowden, deceased, seeking to

recover of appellants, Addie Lyle and Mark Lyle, and a third defendant, Hattie B. Wilson, judgment in the sum of $8,000 with interest from January 22, 1940. It was alleged in the petition that the defendants by fraudulent misrepresentations and undue influence induced the decedent to place the amount of money prayed for to the credit of Addie Lyle in the Union Bank and Trust Company in Irvine, Kentucky; that the decedent was induced to do so at a time when his mind was not sound upon the fraudulent representation that if he failed to so dispose of the money it would be subject to attachment in a suit for damages for personal injuries instituted by one Robert Gumm and then pending against the deceased. It was further alleged that the money was placed to the credit of Addie Lyle in the named bank under an agreement with her that she would hold it in trust for Mr. Snowden. Defense was made that the transfer of the money was a gift inter vivos and that it was not intended that any part of it should be returned to, or held in trust for, the donor. The answer contained a plea of estoppel upon the theory that Snowden transferred the money to defeat recovery of a judgment he feared would be entered against him, and since the purpose behind the transfer was fraudulent, the court will leave the parties in the position they had placed themselves.

Addie Lyle was the sister of Mr. Snowden and Mark Lyle is her son and Hattie Wilson was her daughter. The latter died during the pendency of the action and the petition as to her was dismissed. Mr. Snowden was 79 years of age and Mrs. Lyle 77 at the time of the transaction which is the subject matter of this suit. Other heirs of the decedent consist of nephews and nieces, including appellee, Lyla B. Snowden who was appointed administratrix of his estate. Mr. Snowden was a bachelor and for more than 20 years had made his home at the residence of his sister. Mark Lyle lived in adjoining property to his mother and Mrs. Wilson lived a short distance therefrom.

On January 17, 1940, Robert Gumm, instituted an action against Mr. Snowden in the Estill circuit court to recover $10,150 for personal injuries and loss of time as a result of an accident which occurred in a grist mill owned by Mr. Snowden. Process was served on the defendant in that action on January 20, 1940. At that time and by reason of illness Mr. Snowden was confined in the home of Mrs. Lyle but was not confined to his bed. On

the day the process was served he sent for Alfred Gumm, a nephew (but not related to Robert Gumm), and requested him to consult an attorney as to the advisability of transferring certain money he had on deposit in various banks in order to avoid an attachment in the suit filed, against him. The attorney advised against the transfer. When Gumm related the advice to Mr. Snowden, Mrs. Lyle and Mrs. Wilson were present. Mrs. Wilson suggested that he obtain the legal services of Judge Robert R. Friend which was done. Judge Friend came to the Lyle home, and, advising against the transfer of the money, undertook the defense of the suit. At Mr. Snowden's request Alfred obtained from the Union Bank and Trust Company a memorandum of the balance to Mr. Snowden's deposit with the bank. The memorandum was delivered to the decedent in the presence of Judge Friend, Mrs. Lyle, and Mrs. Wilson. During the course of the consultation, Mrs. Wilson suggested that Mr. Snowden transfer his money to Mrs. Lyle, stating that she had been good to him and that in the event the transfer was attacked, she could claim the money as payment for board. Mr. Snowden rose from his chair and stated that he likewise had been good to Mrs. Lyle.

The second day following, to-wit: January 22, 1940, Mr. Snowden went to the bank, wrote a check against his account in the sum of $8,000 and requested the assistant cashier to deposit it in a savings account to the credit of Mrs. Lyle. The cashier complied with the request, issued a pass book to Mrs. Lyle and delivered it to Mr. Snowden who subsequently delivered it to his sister. On January 29, 1940, the decedent transferred to Mrs. Mark Lyle, a niece by marriage, all of the money he had on deposit in the First National Bank of Nicholasville, Kentucky, amounting to the sum of $1,125.91. On February 12, 1940, he issued a check to Alfred Gumm in the sum of $375 and with Gumm presented it to the assistant cashier of the bank for payment. The cashier thereupon told him that he did not have a sufficient balance to cover the check and suggested that it be charged to the account of Addie Lyle, which was done. Mr. Snowden signed his name to the check and the officer of the bank signed Mrs. Lyle's name thereto and delivered the money to Gumm. On February 15, 1940, Snowden transferred all of his real estate to Alfred Gumm, but the deed was not lodged for record until after Mr. Snowden's death. On February 24, 1940, he transferred to Mrs. Mark Lyle $788.42

representing all the money he had on deposit in the Bank of Commerce in Lexington, Kentucky. The money transferred to Mrs. Mark Lyle admittedly was to be held by her for the use and benefit of Mr. Snowden and neither it nor the transfer of the real estate has any connection with the transaction under consideration in this case. On March 2, 1940, the damage suit was settled by the payment of $100 and costs therein accrued. The check was signed in ink "W. M. Snowden by Alfred Gumm." Above the signature in pencil in the handwriting of the assistant cashier appears the memorandum "Chg Addie Lyle." Upon presentation for payment, the check was honored by the bank and charged to Mrs. Lyle's account. Mrs. Lyle testified that she did not know either of these checks had been charged to the account and neither was charged thereto with her consent. On two or three occasions Mr. Snowden asked the cashier of the bank to transfer the money from Mrs. Lyle's account to his own. He was informed by the officer of the bank that this could not be done unless he presented Mrs. Lyle's pass book. There is no evidence that he ever requested Mrs. Lyle to transfer the money or that he ever requested her to deliver the pass book to him. On September 11, 1940, Mrs. Lyle executed a check against the account in the sum of $3,800 which was presented for payment by her son Mark who delivered the money to his mother and she invested it in government bonds. Mr. Snowden knew of that transaction, made no protest, and complimented Mrs. Lyle on the soundness of her investment. Appellee, Lula B. Snowden, as well as other nieces and nephews knew of the transfer of the money to Mrs. Lyle and of Mrs. Lyle's withdrawal of the $3,800 and investment in government bonds. No protest or objection to these transactions appears to have been made by any of them. Mr. Snowden died March 5, 1941, which was approximately 13½ months after he transferred the money to his sister and one year three days after the settlement of the damage suit. On March 15, 1941, Mrs. Lyle issued another check for $3,000. This check was likewise presented for payment by her son who delivered the money to his mother who in turn invested it in government bonds.

The chancellor gave judgment against Addie Lyle and Mark Lyle in the amount of $8,384.11 with interest from April 15, 1941, the date of appointment of the administratrix. The principal amount of the judgment rep-

resented the $8,000 transferred to Mrs. Lyle with interest thereon until April 15, 1941.

There is no evidence in the record which would justify the rendition of a judgment in any amount against Mark Lyle. It is true that he presented the checks for $3,800 and $3,000 to the bank for payment but in doing so he was acting as a mere agent for his mother. He did not receive any of the money for his own use nor does the evidence point to any willful wrongdoing on his part in cashing the checks. No authority is cited in support of this part of the judgment and it is patently erroneous.

Nor do we believe from reading the whole record that the judgment against Mrs. Lyle is justified. While some of the lay witnesses testified as to the weakened condition of Mr. Snowden's mind at the time he made the transfer, the physician in attendance upon him testified that until a few days before his death his mind was good and he was mentally capable of transacting business and protecting his property; that for 8 or 10 years he had been ill and on 2 or 3 occasions would have temporary setbacks and on these occasions would become delirious, but that upon recovery from the temporary illness his mind was sound and in such condition as enabled him to manage his affairs in a business like manner; that at the time the damage suit was called for trial both he and Mr. Snowden signed an affidavit in support of the motion for continuance in which affidavits each stated that Snowden was physically and mentally unable to be in attendance upon the trial, but the doctor explained this affidavit to the effect that this condition was temporary at the time the affidavit was made and that upon recovery of the temporary illness, his mind was again sound; that by stating that he was mentally unable to attend the trial he did not mean to say that the patient was demented but merely so weak from illness that the mental exertion of attending a trial and testifying would be harmful to his physical condition. Neither Mrs. Lyle nor Mrs. Wilson placed in the decedent's mind the suggestion that he place his money out of reach of the plaintiff in the damage suit although a method of furthering the thought fathered by the decedent was suggested by Mrs. Wilson. It is true he was old and unduly alarmed concerning the outcome of the damage suit but there is evidence that if he transferred the money to Mrs. Lyle for the purpose of defeating recovery in the damage suit, it was an original

thought with him, although the exact method of accomplishing his purpose was suggested by Mrs. Wilson. Mr. Snowden lived 13½ months after he transferred the money to his sister and one year and 3 days after all liability for the injury to Robert Gumm had ceased. We think he would have asserted his rights in respect to this fund in that period of time had he not intended that it be a gift outright to his sister. It is true that he exercised dominion over the fund on two occasions but those actions were not the result of his own thought, they were suggested by the assistant cashier of the bank. The checks he issued were against his own account and the bank, through its officer, altered the checks and charged them against the account of Mrs. Lyle. But whatever the status of the account at the time of these transactions and whatever the dominion Mr. Snowden asserted over the fund on these occasions, when he stood by and permitted Mrs. Lyle to withdraw $3,800 of the fund and invest it in government bonds for herself and approved the investment, he recognized her right of absolute dominion over the fund; and, if the gift had not been consummated to that time, his approval of that transaction was a definite relinquishment of control of the account. He transacted business at all times during the year previous to his death, Mrs. Lyle was his closest relative, she was the person with whom he made his home, she was the one who cared for him during illness and at all other times; and was the first natural object of his bounty. The evidence shows that on several occasions previous to the accident for which he was sued, he expressed the intention of giving his property to his sister and that after he had done so, he made the statement that he had taken care of her. There was evidence that he made the statement to one or two persons after the transfer was made that it was not a gift to Mrs. Lyle and that she was going to transfer the money back to him, but his actions for almost a year thereafter in respect to the account are not consistent with this contention. The elements necessary to constitute a gift inter vivos are succinctly set out in Gernert v. Liberty Nat. Bank & Trust Co., 284 Ky. 575, 145 S. W. (2d) 522, 525, and are: (1) There must be a competent donor; (2) There must be an intention on the part of the donor to make the gift; (3) There must be a competent donee; (4) The gift must be complete, with nothing left undone; (5) The property must be delivered and the delivery have immediate ef-

fect, and, (6) The gift must be irrevocable. We are of the opinion, as above indicated, although there is some evidence to the contrary, that the preponderance of evidence shows Mr. Snowden to have been competent both at the time he transferred the money to his sister's account and at the time he demonstrated clearly that he recognized her ownership of it by approving the investment she made. If he did not have the intention to make the gift at the time he transferred the fund, his conduct clearly evinces such intention thereafter. That Mrs. Lyle was competent to receive the money is not questioned. By placing the money in the savings account in the name of his sister and delivering the pass book to her, the gift was complete, delivery of the property went into immediate effect and was irrevocable. The fact that the bank charged two of Mr. Snowden's checks to the account has no bearing upon this question. Clearly it was not authorized to make either charge. The evidence clearly shows that Mr. Snowden became reconciled to the fact that the gift was irrevocable because after he attempted to revoke it, he took no action to recover the money, although many months intervened between his attempt to revoke the gift and his death. We are, therefore, of the opinion that the chancellor erred in giving judgment against either appellant. Having arrived at that conclusion it is unnecessary for us to determine whether Mr. Snowden's estate is estopped from claiming the fund under the equitable maxim that "He who comes into equity must come with clean hands."

The judgment is reversed.